FILED

2024 Jan-09  PM 02:42
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **CYNTHIA FLETCHER,** )<br>)<br>**Plaintiff,** )<br>)<br>**v.** )<br>)<br>**THE J.M. SMUCKER COMPANY** )<br>**and BIG HEART PET BRANDS,** )<br>**INC.,** )<br>)<br>**Defendants.** ) | **Case No.: 2:21-cv-1411-AMM** |

## <u>MEMORANDUM OPINION ON DEFENDANTS' MOTION FOR</u>
## <u>SUMMARY JUDGMENT</u>

This case is before the court on a motion for summary judgment by defendants The J.M. Smucker Company ("Smucker") and Big Heart Pet Brands, Inc. ("Big Heart") (collectively, "the Manufacturers"). Doc. 30. For the reasons explained below, the motion is **GRANTED**.

## I.    BACKGROUND

Facts set forth in the parties' statement of material undisputed facts are deemed admitted for summary judgment purposes unless controverted by the response or reply of the opposing party. These are the undisputed material facts construed in the light most favorable to plaintiff Cynthia Fletcher, and those disputed by the Manufacturers but construed against them for purposes of their summary

judgment motion:

###    A.    General Information & Relevant Policies

Smucker acquired Big Heart in 2015. Doc. 31-6 at 6; Doc. 31-11 at 2. Together, the Manufacturers "produce[] and distribute[] a variety of branded pet food and pet snacks in the United States." Doc. 33 at 5 (citing Doc. 31-9 at 2–3, ¶ 3). The Manufacturers operate a facility in Decatur, Alabama. *Id.* At all times relevant to this lawsuit, Ms. Fletcher was employed at the Decatur Facility. *Id.* "The Decatur facility manufactures and distributes Meow Mix cat food products." *Id.* (quoting Doc. 31-9 at 3, ¶ 5). The Manufacturers maintained four types of human resources policies at the Decatur Facility that are pertinent to this lawsuit.

*First*, the Manufacturers maintained Equal Employment Opportunity and Anti-Harassment/Discrimination Policies that prohibited, among other things, discrimination on the basis of race or sex. Doc. 31-1 at 111–18. The Anti-Harassment/Discrimination Policy also contained a "No Retaliation Guarantee." *Id.* at 118. The Manufacturers regularly held training sessions for Decatur Facility employees "with regard to policies related to discrimination, harassment, and retaliation." Doc. 31-2 at 6, Dep. 16:10–16; *see also* Doc. 31-1 at 18–19, Dep. 65:17–66:13; *id.* at 106, DX 1; Doc. 31-4 at 15–16, Dep. 52:20–53:23; Doc. 31-5 at 6–7, Dep. 16:12–16, 17:15–18:20, 19:19–20:21; *id.* at 49, Dep. 186:16–21; *id.* at 104, PX 4; Doc. 31-9 at 3, Decl. ¶ 7. Certain team members did not remember receiving this

training or testified that they did not receive it. *See* Doc. 31-8 at 10, Dep. 32:6–11; Doc. 31-5 at 7, Dep. 18:21–19:8; Doc. 31-7 at 27, Dep. 99:7–16. Ms. Fletcher testified that she was informed of these policies while employed at the Decatur Facility. *See* Doc. 31-1 at 19–20, Dep. 66:1–70:9.

*Second*, the Manufacturers maintained a Corrective Action Policy. Doc. 31-1 at 119–121. "The Corrective Action Policy is progressive and all-inclusive." *Id.* at 120. It addressed "Attendance Violations[,] Quality violations[,] Safety violations NOT included in the Major Safety Violation Policy[,] Performance issues[, and] Behavioral issues." *Id.* The policy provided for five progressive action steps: (1) Verbal Coaching; (2) First Written Warning; (3) Second Written Warning; (4) Final Written Warning; and (5) Review for Termination. *Id.* at 121. The Manufacturers' corporate representative "testified the progressive corrective action steps also include suspension and a last chance agreement to be used at management's discretion." Doc. 38 at 6 (citing Doc. 31-7 at 18–21, Dep. 64:15–65:8 and 72:22–73:20). The Corrective Action Policy also provided that "[d]epending on the severity of the offense, steps may be skipped." Doc. 31-1 at 121. And "[a]ll corrective actions . . . will remain in effect for a period of twelve (12) months from the date the corrective action was issued." *Id.*

*Third*, the Manufacturers maintained an Attendance Policy. *Id.* at 122–25. This policy provided that attendance points accumulate per the following schedule:

|  | Incident | # of Points |
|---|---|---|
| 1. | Arriving late 2 hours or less or leaving early 2 hours or less | ½ point |
| 2. | More than 2 hours late or leaving early more than 2 hours | 1 point |
| 3. | Absence for an entire shift with proper absence notification | 1 point |
| 4. | Absences of 2 or more consecutive days with proper notification & doctor's release | 1 point |
| 5. | Absence for an entire shift without proper Absence notification (notify less than one (1) hour prior to the start of designated shift) | 1.5 points |
| 6. | No call/no show for an entire shift | 2 points |
| 7. | No call/no show of 3 consecutive days absent unique circumstances will be considered job abandonment | |

*Id.* at 124. The Attendance Policy defined an "absence" as "any time an employee misses a scheduled work shift (including overtime) for an unexcused reason." *Id.* at 123. Ms. Fletcher clarified that if employees used their allotted time off to cover an absence and called in at least an hour before their shift to provide notice, they would not receive a point. *See* Doc. 31-5 at 14, Dep. 45:14–46:15. And Ms. Fletcher relies on sworn testimony from Francisco Perez, a team leader at the Decatur Facility, that "[t]eam leaders had the authority to approve an employee leaving early and they would not receive a point." Doc. 38 at 6–7 (citing Doc. 31-5 at 15, Dep. 50:14–16, 51:1–16).

The Attendance Policy provides that absences correspond to a level of Corrective Action under the following schedule:

4

| Points | Levels of Corrective Action |
|--------|------------------------------|
| 1–3 | Step 1: Routine Coaching (Documented & Signed) |
| 4 | Step 2: 1st Written Warning (Documented & Signed) |
| 5 | Step 3: 2nd Written Warning (Documented and Signed) |
| 6 | Step 4: Final Warning (Documented and Signed) |
| Over 6 | Step 5: Termination |

Doc. 31-1 at 125. The Attendance Policy also provided that the Manufacturers were "not required to take any corrective action step before making an adverse employment decision, including termination." *Id.* Further, "[n]othing provided in this Attendance policy waives the Company's right to implement discipline at its sole discretion (as to form and extent) for employee misconduct, including absenteeism and tardiness." *Id.*

*Fourth*, the Manufacturers maintained a Use of Telephones & Cellular Telephones Policy ("Cell Phone Policy"). *Id.* at 126–28. This policy provided that "[w]hile employee personal cellular telephones are not strictly prohibited in our workplace, personal cellular usage must be limited in the same way that personal calls on the office/facility telephones are limited." *Id.* at 127. Specifically, the policy provided that "personal use of the telephone should be limited and personal calls should be brief." *Id.* The Cell Phone Policy also states that "Managers, the Research & Development team, the plants, and the Human Resources Department have discretion to adopt more specific rules regarding the use of cell phones at their work site or in their department." *Id.* Employees who violated the Cell Phone Policy were "subject to discipline, up to and including termination of employment." *Id.* at 128.

5

The parties dispute employees' use of cell phones at the Decatur Facility. The Manufacturers allege that technicians were ordinarily "not allowed to use their cell phones on the production floor, and cell phones must be used away from the equipment behind the yellow aisle if phones need to be used, unless they have approval from their team leader." Doc. 33 at 10 (citing Doc. 31-1 at 22, Dep. 78:13–16; Doc. 31-3, Dep. 58:1–4; Doc. 31-4, Dep. 95:4–8; Doc. 31-9 at 3 ¶ 6). Ms. Fletcher argues that Mr. Perez "routinely ask[ed] employees to use their personal cell phones to take pictures and videos of their line to help with repairs and troubleshoot because there are a lot of settings on the line and an employee can't keep all the notes." Doc. 38 at 8 (citing Doc. 31-5 at 31, Dep. 114:20–115:10).

Further, Ms. Fletcher relies on testimony from Mr. Perez stating that employees "may use their personal cell phones to check their work time and any training tests that need to be taken in the app Workday that is loaded on employees' personal cell phones, as well as work alerts and Outlook emails downloaded [on] an employee's phone." *Id.* (citing Doc. 31-5 at 31–32, Dep. 115:17–120:10). Also, Ms. Fletcher argues that "it [was] common for employees to send and receive text messages on their personal cell phones assigning them tasks and employees would text their team lead if they needed help." *Id.* at 8–9 (citing Doc. 31-5 at 33, Dep. 121:2–123:6).

### B.    Ms. Fletcher's Employment

Ms. Fletcher began working for the Manufacturers at the Decatur Facility on July 23, 2018. Doc. 31-1 at 16, Dep. 54:2–10. Ms. Fletcher worked as a Technician in the Pack Department. *Id.* at 17, Dep. 59:23–60:2. Her responsibilities "were to keep the equipment running in her area, perform monthly and quarterly preventative maintenance on the equipment, and engage in various cleaning activities as to this machinery and area of the facility." Doc. 33 at 11, ¶ 27 (citing Doc. 31-1 at 16, Dep. 54:19–55:13).

### 1.    Ms. Fletcher's Safety Violation

"On July 12, 2019, [Ms.] Fletcher was issued a Verbal Warning for not wearing the required PPE (gloves) when using a tool on her line to change out a roll of film on Line 1 EDL." Doc. 33 at 12. The Manufacturers contend that "[t]here was signage on the Pack lines, including Line 1, regarding the required PPE when changing out a roll of film, but [Ms.] Fletcher failed to follow this important safety notice, resulting in her own injury." *Id.* (citing Doc. 31-1 at 130). When the Manufacturers issued Ms. Fletcher a verbal warning for this safety violation, she acknowledged that "[f]ailure to correct unacceptable performance may result in further disciplinary action, up to and including termination." Doc. 31-1 at 130. According to the Corrective Action policy, this infraction should have "rolled off" of Ms. Fletcher's disciplinary history after one year—on July 12, 2020.

*See* Doc. 38 at 9.

## 2.    Ms. Fletcher Receives a Second Written Warning

On June 23, 2020, Ms. Fletcher received a second written warning for accruing five points under the Attendance Policy. Doc. 31-1 at 27, Dep. 99:11–17; *id.* at 131. Ms. Fletcher asserts that the Manufacturers incorrectly calculated her points and that she should not have received a second written warning. *See id.* at 28, Dep. 102:6–10. According to Ms. Fletcher, she has screenshots that prove that "she worked on days she received points." Doc. 38 at 9 (citing Doc. 31-1 at 56). The parties agree that Ms. Fletcher acknowledged and signed the second written warning, and that she raised questions regarding three of her alleged absences. Doc. 31-1 at 131; *id.* at 29, Dep. 106:18–23; Doc. 31-4 at 32, Dep. 120:5–11.

Ms. Fletcher cites deposition testimony by Mr. Perez that he was her supervisor on days that she received absentee points, but that he did not give her any of those points. *See* Doc. 31-5 at 41, Dep. 155:16–156:11. The Manufacturers allege that they rechecked and reverified that Ms. Fletcher should have and did receive five attendance points. Doc. 31-1 at 131; *id.* at 29, Dep. 106:18–107:3; Doc. 31-4 at 32, Dep. 120:12–17. Ms. Fletcher disputes that the Manufacturers rechecked and verified her points. To support her assertion that they did not, she cites Interim site Human Resources Representative Shauronda Harper's signature and date on her second written warning, which was dated August 17, 2020—the date of Ms.

Fletcher's termination. *Id.* at 131; *see also* Doc. 31-2 at 30, Dep. 109:2–3.

### 3.    Ms. Fletcher Receives a Final Written Warning

In March 2020, the COVID-19 pandemic affected operations at the Decatur Facility. *See* Doc. 31-9 at 4, ¶ 9. The Manufacturers implemented safety precautions that included: "mandatory use of face masks within the facility, symptom assessments of employees and visitors prior to entry into the facility, maximum occupancy restrictions in interior rooms, required six feet social distancing with no avoidable contact of less than six feet exceeding five minutes, [and] sanitary measures such as biomisting." Doc. 33 at 15, ¶ 40 (citing Doc. 31-1 at 29, Dep. 107:20–109:18; *id.* at 132; Doc. 31-5 at 23, Dep. 83:11–23; *id.* at 49, Dep. 187:16–188:13; Doc. 31-3 at 18, Dep. 61:21–62:8; Doc. 31-9 at 4, ¶¶ 10-11). Ms. Fletcher disputes that the Manufacturers thought that COVID-19 was a major concern because the Plant Manager, Bob Latter, scheduled "employees for all shifts to work on July 23, 2020, on the same shift at the same time." Doc. 38 at 11 (citing Doc. 31-5 at 21, Dep. 74:8–11).

The Manufacturers argue in reliance on sworn testimony that they conveyed the COVID-19-related policies "to all employees in the facility in Daily Direction Setting (DDS) meetings, via email, via signage and electronic billboards (television monitors), and via other methods of communication." Doc. 33 at 15–16, ¶ 41 (citing Doc. 31-1 at 29–30, Dep. 109:9–18, 113:12–23; *id.* at 132; Doc. 31-5 at 49, Dep.

187:16–188:7; Doc. 31-9 at 4, ¶ 12). Ms. Fletcher does not specifically dispute that statement but argues that her testimony does not support it. *See* Doc. 38 at 12, ¶¶ 41–42. The Decatur Facility Operations Manager, Clint Price, "notified the entire facility via email on June 14, 2020, that violations of these [COVID-19-related] protocols would constitute policy violations and/or misconduct subject to discipline under the Corrective Action Policy, just like other safety violations." Doc. 33 at 16–17, ¶ 45 (citing Doc. 31-1 at 30–31, Dep. 111:15–115:8; *id.* at 132; Doc. 31-2 at 14, Dep. 55:5–8; Doc. 31-4 at 20, Dep. 69:6–18; Doc. 31-8 at 8, Dep. 24:17–21; Doc. 31-9 at 5, ¶ 16).

Ms. Fletcher "received this communication via her Smucker-issued email account." *Id.* at 17, ¶ 46 (citing Doc. 31-1 at 30–31, Dep. 111:15–115:8; *id.* at 132; Doc. 31-9 at 5, ¶ 17). In the email, Mr. Price "specifically identified examples of COVID-19 protocol violations that would warrant discipline, including, among other conduct, violation of the social distancing and mask requirements at the facility. *Id.* ¶ 47 (citing Doc. 31-9 at 30–31, Dep. 113:7–115:8; *id.* at 132; Doc. 31-9 at 5, ¶ 18). Mr. Price also directed all managers and supervisors to go over the policy with their employees to ensure that all employees understood the policies and the corrective actions that would accompany violations of the policies. *See* Doc. 31-1 at 30, Dep. 113:7–23; Doc. 31-3 at 18, Dep. 61:21–62:8; Doc. 31-9 at 5, ¶ 19.

"On the week of July 20, 2020, the Decatur facility conducted a planned

facility-wide shutdown for routine maintenance and cleaning." Doc. 33 at 17, ¶ 49 (citing Doc. 31-1 at 30, Dep. 111:10–14; Doc. 31-2 at 17, Dep. 60:8–13; Doc. 31-5 at 50, Dep. 190:23–191:13; Doc. 31-8 at 11, Dep. 36:5–12). Ms. Fletcher was scheduled to work on July 23, 2020. *Id.* at 18, ¶ 50 (citing Doc. 31-1 at 31, Dep. 115:22–116:12; Doc. 31-4 at 20, Dep. 69:22–70:5; Doc. 31-3 at 18, Dep. 63:3–15).

When Ms. Fletcher arrived at work, she attended a meeting "in which leadership informed her and the other technicians on the specific work to be performed that day." *Id.* ¶ 51 (citing Doc. 31-1 at 32, Dep. 120:6–19; *id.* at 38, Dep. 144:2–21; *id.* at 135; Doc. 31-8 at 11, Dep. 36:19–23).

The parties dispute the facts of the incident that led to Ms. Fletcher receiving her final written warning. The Manufacturers argue that once the meeting ended, Ms. Fletcher was released to perform her assigned work but that she failed to do so. Doc. 31-1 at 135; Doc. 31-3 at 20, Dep. 70:2–17. Instead, she, Mallory Warren, and Tammie Robinson "gathered in the palletizer area and began talking." Doc. 33 at 18, ¶ 53 (citing Doc. 31-1 at 34–35, Dep. 128:1–13, 132:19–133:1; *id.* at 135; Doc. 31-4 at 20–21, Dep. 72:23–73:4; *id.* at 27, Dep. 97:5–8; Doc. 31-3 at 17–18, Dep. 60:13–61:4; *id.* at 20–21, Dep. 70:2–71:10, 76:3–16). "While talking, all three women failed to adhere to the facility's well-known social distancing rules, requiring all employees to maintain a distance of six feet apart from each other." *Id.* at 18–19, ¶ 54 (citing Doc. 31-1 at 39, Dep. 146:2–14; *id.* at 135; Doc. 31-2 at 26, Dep. 96:12–

15; Doc. 31-5 at 20, Dep. 69:22–70:19). Jon Chafee, a Manager at the Decatur Facility, walked through the area and observed the three employees "standing around outside their assigned work area on the production floor while violating social distancing rules and using their cell phones in violation of Defendants' Cell Phone Policy." *Id.* at 19, ¶ 55 (citing Doc. 31-1 at 135; Doc. 31-2 at 28, Dep. 104:12–20; *id.* at 51, Dep. 195:15–22; Doc. 31-5 at 31, Dep. 114:20–115:16; Doc. 31-4 at 26, Dep. 95:1–16; Doc. 31-3 at 20–21, Dep. 70:2–17, 76:3–19; Doc. 31-11 at 3, ¶ 5).

According to Mr. Chaffee, he "approached [Ms.] Fletcher and her co-workers and directed them to separate and get back to work." Doc. 31-11 at 3, ¶ 6. But the Manufacturers argue that the group did not separate. *See* Doc. 31-5 at 20–21, Dep. 72:18–73:6. Mr. Chaffee reported the violation to Mr. Price. Doc. 31-11 at 3, ¶ 7. Mr. Price asked Ms. Fletcher's Team Leader, Wanda Orr, "to verify the group had dispersed and returned to work as they were instructed." Doc. 33 at 20, ¶ 59 (citing Doc. 31-3 at 17–18, Dep. 60:12–61:4; *id.* at 20, Dep. 69:1–16, 71:11–14). When Ms. Orr found Ms. Fletcher and her co-workers, they were still violating social-distancing rules and using their phones in violation of the Cell Phone Policy. *See id.* ¶ 60 (citing Doc. 31-1 at 135; Doc. 31-4 at 22, Dep. 78:21–79:1).

The leadership at the Decatur Facility reviewed video footage of the event and found that Ms. Fletcher was subject to discipline. Doc. 31-1 at 135; Doc. 31-4 at 21, Dep. 76:6–20; Doc. 31-3 at 17–18, Dep. 60:12–61:4; *id.* at 20, Dep. 69:1–16, 71:11–

14. Because Ms. Fletcher already had received a second written warning, she received the next step of discipline according to the Corrective Action Policy—a final written warning. Doc. 31-2 at 23, Dep. 81:4–5; Doc. 31-4 at 37, Dep. 139:21–140:10.

According to Ms. Fletcher, when the morning meeting was over, she "reported to the warehouse and [Mr.] Alvarez informed her and the other employees that they were unable to do anything until after break because the contractors and maintenance employees were working on the palletizer preventing them from working until after break." Doc. 38 at 12, ¶ 52 (citing Doc. 31-1 at 32–33, Dep. 120:6–19, 121:9–122:3; *id.* at 35, Dep. 132:15–133:14). Thus, Ms. Fletcher testified that she was not in the palletizer area as the Manufacturers allege. *See* Doc. 31-1 at 35, Dep. 132:2–14. Ms. Fletcher further argues that she "was able to stay six feet apart [from Ms. Warren and Ms. Robinson] most of the time." Doc. 38 at 13, ¶ 54 (citing Doc. 31-1 at 29, Dep. 109:5–8).

Ms. Fletcher argues that when Mr. Chaffee walked past her in the warehouse area, he "saw other employees including [Mr.] Alvarez and four or five other men, majority Caucasian, who were in a group talking." *Id.* ¶ 55 (citing Doc. 31-1 at 33–34, Dep. 122:8–16, 126:20–22; *id.* at 36, Dep. 137:4–22). She contends that Mr. "Chaffe[e] instructed [Mr.] Alverez and the other employees to spread out." *Id.* (citing Doc 31-1 at 36, Dep. 134:4–14). During this time, Ms. Fletcher received an

email on her phone stating that an employee had tested positive for COVID-19 and she, Ms. Warren, and Ms. Robinson were discussing this information. *Id.* (citing Doc. 31-1 at 38, Dep. 145:9–16).

Ms. Fletcher disputes that Mr. Chaffee ever told the employees to get back to work. *See* Doc. 31-1 at 34, Dep. 128:13–18, 129:9–11. And she argues that all three of the employees returned to work "less than ten minutes after the meeting." Doc. 38 at 14, ¶ 58 (citing Doc. 31-3 at 22, Dep. 78:14–79:11). Ms. Fletcher argues that she refused to sign the second written warning. *See* Doc. 31-1 at 135. The court must construe these disputed facts in favor of Ms. Fletcher and against the Manufacturers at this stage.

### 4. Ms. Fletcher Complains About the Unfairness of her Final Written Warning

When the Manufacturers provided Ms. Fletcher her final written warning (the date of that notification is disputed by the parties), she complained that only Black employees (herself, Ms. Warren, and Ms. Robinson) were disciplined but that other white employees were engaging in similar activities at the time but did not face discipline. Doc. 31-1 at 40–41, Dep. 153:10–154:5; Doc. 31-2 at 11, Dep. 35:8–36:15; *id.* at 12, Dep. 37:10–15; *id.* at 14, Dep. 46:14-17; Doc. 31-4 at 16, Dep. 64:14–22; Doc. 31-9 at 7–8, ¶ 27). Ms. Fletcher told Ms. Harper that the discipline was discriminatory. Doc. 31-1 at 37, Dep. 139:19–140:6; Doc. 31-2 at 11, Dep. 36:16–23; Doc. 31-4 at 112.

Ms. Harper investigated Ms. Fletcher's discrimination claim. Doc. 31-2 at 13, Dep. 41:17–21. The parties dispute the thoroughness of that investigation. *Id.* at 11, Dep. 35:11–14, 36:6–15; Doc. 33 at 23; Doc. 38 at 18, ¶ 70. Ms. Harper testified that as part of her investigation, she watched video footage of the incident that Ms. Fletcher referenced. *See* Doc. 31-9 at 8, ¶¶ 30–31. When she reviewed the footage, she observed Ms. Robin Chavers, a white female, and Mr. Rafael Ramirez, a Hispanic male, "standing farther away in the palletizer area and talking without social distancing." *Id.* ¶ 34. Based on the footage, the Manufacturers determined that Ms. Chavers and Mr. Ramirez violated the COVID-19 safety protocols and disciplined them as well. *Id.* at 9, ¶ 37.

### 5.    Ms. Fletcher Is Absent on August 14, 2020 and Is Terminated

On August 14, 2020, Ms. Fletcher failed to appear for a scheduled overtime shift. Doc. 31-1 at 43, Dep. 162:20–163:9; Doc. 31-2 at 30, Dep. 110:4–9; Doc. 31-4 at 10–11, Dep. 32:17–33:1. Ms. Fletcher called in before the shift to alert the Manufacturers that she would not be at work that day. Doc. 31-1 at 44, Dep. 166:10–15. According to the Manufacturers, the unexcused absence "resulted in Fletcher accruing another attendance point and being issued the next step of progressive discipline pursuant to the facility's Attendance and Corrective Action policies." Doc. 33 at 25, ¶ 82 (citing Doc. 31-1 at 136).

Ms. Fletcher, however, argues that she should not have received an attendance

point for missing that shift because "she had vacation time to use and called in over an hour before her shift started . . . ." Doc. 38 at 20, ¶ 81.

In any event, according to the Manufacturers' calculation of Ms. Fletcher's points on the corrective action schedule—a calculation that Ms. Fletcher disputes—the Manufacturers terminated Ms. Fletcher's employment in August 2020. Doc. 31-1 at 137.

### 6.    The Manufacturers Hire Ms. Heather Terry

Sometime after the Manufacturers terminated Ms. Fletcher, the Manufacturers hired Ms. Heather Terry, a white female, as a packing technician. Doc. 31-9 at 11–12, ¶ 49.

### C.    Additional Facts

Ms. Fletcher alleges additional facts that she says preclude summary judgment. According to Ms. Fletcher, the Manufacturers gave Kody Garner, a male packing technician, a "last chance agreement" instead of terminating him. Doc. 38 at 31, ¶ 1 (citing Doc. 31-2 at 159). Ms. Fletcher also argues that another male packing technician, Michael Harris, received a last chance agreement. *See* Doc. 31-2 at 173. And Ms. Fletcher argues that two other male packing technicians—Montoya Jackson and Brandon Black—received final written warnings even though they had enough points for termination under the Corrective Action Policy. *See id.* at 178; Doc. 31-9 at 126. Ms. Fletcher additionally contends that the Manufacturers

16

incorrectly administered discipline in Morris Bates's, another employee's, favor. *See* Doc. 31-9 at 118.

### D.    Ms. Fletcher Files an EEOC Charge and Lawsuit

On February 8, 2021, Ms. Fletcher filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging race and sex discrimination as well as retaliation. Doc. 31-1 at 138. On July 23, 2021, the EEOC issued its Dismissal and Notice of Rights. *Id.* at 139. Ms. Fletcher filed this lawsuit on October 20, 2021, alleging race and sex discrimination and retaliation under Title VII and 42 U.S.C. § 1981 against the Manufacturers. Doc. 1.

The Manufacturers moved for summary judgment. Doc. 30. Ms. Fletcher filed a response, Doc. 38, and the Manufacturers filed a reply, Doc. 45.[1] The motion is fully briefed.

### II.    LEGAL STANDARD

A party moving for summary judgment must establish "that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it could "affect the outcome" of the case. *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1303 (11th Cir. 2016) (cleaned up). A material fact is in "genuine" dispute if "the evidence is

---

[1] The court **GRANTS** Ms. Fletcher's Motions for Leave to File Excess Pages, Doc. 39, and for Extension of Time, Doc. 40.

such that a reasonable jury could return a verdict for the nonmoving party." *Id*. (cleaned up). In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (cleaned up).

## III.    ANALYSIS

### A.    Ms. Fletcher's Discrimination Claim

Ms. Fletcher brings claims of racial discrimination against the Manufacturers under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. "Title VII of the Civil Rights Act of 1964 outlaws employment discrimination because of 'race, color, religion, sex, or national origin.'" *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 943 (11th Cir. 2023) (quoting 42 U.S.C. § 2000e-2(a)(1)). "Likewise, 42 U.S.C. § 1981 prohibits employers from intentionally discriminating on the basis of race in employment contracts." *Id.* at 944. "To prove a claim under either statute, a plaintiff can use direct evidence, circumstantial evidence, or both." *Id.*

"Discrimination claims brought under Title VII may be pursued under a 'single-motive' theory—in which the employee alleges that unlawful bias was 'the true reason' for an adverse employment action . . . ." *Phillips v. Legacy Cabinets*, 87

F.4th 1313, 1321 (11th Cir. 2023) (quoting *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016)). Or a plaintiff may employ "a 'mixed-motive' theory—in which she alleges that bias was simply '*a* motivating factor' for the adverse action, 'even though other factors also motivated the practice.'" *Id.* (quoting 42 U.S.C. § 2000e-2(m)). "Section 1981 claims brought alongside Title VII claims may be pursued under the single-motive theory only." *Id.*

"In order to survive summary judgment, a plaintiff alleging intentional discrimination [under Title VII] must present sufficient facts to permit a jury to rule in her favor." *Lewis v. City of Union City* (*Lewis I*), 918 F.3d 1213, 1220 (11th Cir. 2019). "One way that she can do so is by satisfying the burden-shifting framework set out in *McDonnell Douglas*" for single-motive cases. *Id.* "A plaintiff can also present direct evidence of discriminatory intent, . . . or demonstrate a 'convincing mosaic' of circumstantial evidence that warrants an inference of intentional discrimination . . . ." *Id*. at 1220 n.6. Additionally, a plaintiff "employee can succeed on a mixed-motive claim [under Title VII] by showing that illegal bias, such as bias based on sex or gender, 'was a motivating factor for' an adverse employment action, 'even though other factors also motivated' the action." *Quigg*, 814 F.3d at 1235 (quoting 42 U.S.C. § 2000e-2(m)). Ms. Fletcher's claims cannot survive summary judgment under any of these theories.

### 1.    Ms. Fletcher's Claim Cannot Survive Summary Judgment Under the *McDonnell Douglas* Framework

Ms. Fletcher first argues that she presents sufficient facts to satisfy the single-motive burden-shifting approach laid out in *McDonnell Douglas*. *See* Doc. 38 at 37–40. To establish a *prima facie* case of discrimination under *McDonnell Douglas*, a plaintiff must show "(1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that her employer treated 'similarly situated' employees outside her class more favorably." *Lewis I*, 918 F.3d at 1220–21. The plaintiff may also satisfy the fourth element by demonstrating that "he was replaced by a person outside his protected class." *Maynard v. Bd. of Regents of Univs. of Fla. Dep't of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003).

"If the plaintiff succeeds in making out a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions." *Lewis I*, 918 F.3d at 1221. "The defendant need not persuade the court that it was actually motivated by the proffered reason, but need only present evidence raising a genuine issue of fact as to whether it discriminated against the plaintiff." *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010).

"Finally, should the defendant carry its burden, the plaintiff must then demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination, an obligation that merges with the plaintiff's ultimate burden of

persuading the factfinder that she has been the victim of intentional discrimination." *Lewis I*, 918 F.3d at 1221 (cleaned up).

"To show pretext, [Ms. Fletcher] must demonstrate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *Alvarez*, 610 F.3d at 1265 (quoting *Combs v. Plantation Patterns,* 106 F.3d 1519, 1538 (11th Cir. 1997)). The plaintiff cannot "recast an employer's proffered nondiscriminatory reasons or substitute [her] business judgment for that of the employer." *Id.* (quoting *Chapman v. AI Transp.,* 229 F.3d 1012, 1030 (11th Cir.2000) (en banc)). So long as the employer proffers a reason "that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and [she] cannot succeed by simply quarreling with the wisdom of that reason." *Id.* at 1265–66 (quoting *Chapman*, 229 F.3d at 1030).

The Manufacturers contend that Ms. Fletcher's "*prima facie* case fails because she cannot identify any similarly situated employee outside of her protected class who received more favorable treatment, or show she was replaced by an individual outside of her protected class." Doc. 33 at 29. Ms. Fletcher responds with "evidence that similarly situated male employees were treated more favorably and were not disciplined or terminated for the same or similar offenses as [her]." Doc. 38 at 35.

And she argues that the Manufacturers replaced her with Ms. Terry, a white female, after she was terminated. *See id.* On reply, the Manufacturers repeat that Ms. Fletcher failed to identify a proper comparator. Doc. 45 at 5. And the Manufacturers contend that even if Ms. Fletcher did identify comparators, the Manufacturers treated Ms. Fletcher better than they treated the comparators. *Id.* at 7–8.

Ms. Fletcher has made out a prima facie case because she has established at least a genuine dispute as to whether she was "replaced" by Ms. Terry, a white female. Although the Manufacturers contend that they did not specifically replace Ms. Fletcher, they admit that "[t]he headcount for trained technicians was replaced at the time of Fletcher's termination by Heather Terry." Doc. 33 at 27, ¶ 90. A reasonable jury could agree with Ms. Fletcher's allegation that she was replaced because "the next person hired to be a packing technician" was a white female. Doc. 38 at 35.

Accordingly, the burden shifts to the Manufacturers "to rebut the resulting presumption of discrimination by producing evidence that [they] acted for a legitimate non-discriminatory reason." *Alvarez*, 610 F.3d at 1265. The Manufacturers have provided a legitimate, nondiscriminatory reason for terminating Ms. Fletcher: multiple violations of the Manufacturers' policies. There is no dispute that Ms. Fletcher violated safety policies, the COVID-19 Policy, and the Attendance Policy on multiple occasions. The undisputed evidence supports the Manufacturers'

22

assertion that they "terminated [Ms.] Fletcher's employment for engaging in a direct violation of the Attendance Policy that had been communicated to her, and on which she had just recently been counseled while already on a Final Written Warning." Doc. 33 at 32; *see also* Doc. 31-1 at 43, Dep. 162:20–165:20; Doc. 31-2 at 30, Dep. 110:4–17; Doc. 31-4 at 10–11, Dep. 32:17–33:1.

"The burden then shifts back to the plaintiff to show that the employer's proffered reason was not its true reason, which merges with the plaintiff's ultimate burden of persuading the court that the employer intentionally discriminated against her." *Alvarez*, 610 F.3d at 1265. Ms. Fletcher argues that the Manufacturers' stated reason for her termination was pretextual on two different bases: (1) comparator male employees received favorable treatment and (2) the Manufacturers miscalculated her disciplinary points. Doc. 38 at 32–40. Ms. Fletcher fails to establish pretext under either basis.

Ms. Fletcher's argument that the male packing technician comparators received more favorable treatment from the Manufacturers does not establish pretext because she fails to demonstrate that the comparators were "similarly situated in all material respects." *Lewis I*, 918 F.3d at 1226. Three of the alleged comparators— Mr. Garner, Mr. Harris, and Mr. Bates—are not comparators because Ms. Fletcher produces no evidence that demonstrates that "the decisionmakers for [her] discipline and termination had actual knowledge or were involved in the disciplinary actions"

of those three employees. Doc. 45 at 6. But a plaintiff ordinarily cannot argue that a fellow employee is a comparator if the employee was under the jurisdiction of a different supervisor, *see Lewis I*, 918 F.3d at 1227–28, or if the decisionmaker in her case did not know about the discipline issued to her alleged comparators, *see Jones v. Gerwens*, 874 F.2d 1534, 1542 (11th Cir. 1989).

Mr. Jackson and Mr. Black are not comparators either. All that Ms. Fletcher argues with respect to those two employees is that they had enough points for termination under the disciplinary policy but that they received final written warnings instead. *See* Doc. 38 at 34, ¶¶ 15, 17. But Ms. Fletcher ignores the substantive difference between her disciplinary history and those two employees' disciplinary history. Ms. Fletcher received discipline for a safety violation, Doc. 31-1 at 130, violating the Attendance Policy, *id.* at 131, 136, and for violating the Cell Phone and COVID-19-related Policies, *id.* at 135. Although Ms. Fletcher may dispute the underlying facts concerning those violations, there is no dispute that her disciplinary history differs from what she alleges about Mr. Jackson's and Mr. Black's disciplinary history. Because their disciplinary history is substantively different, these two employees cannot be considered comparators for the purpose of establishing pretext. *See Lewis I*, 918 F.3d at 1228.

Ms. Fletcher also disputes the accuracy of the Manufacturers' calculation of her disciplinary points under the Corrective Action Policy and asserts, without

pointing to any evidence, that a jury could conclude that a miscalculation, if one occurred, was the result of discrimination. *See* Doc. 38 at 41. But that argument fails to demonstrate a genuine issue of material fact because it lacks any support in the record. And it misplaces the focus of the pretext analysis on Ms. Fletcher's beliefs. "The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head." *Alvarez*, 610 F.3d at 1266.

Ms. Fletcher asks this court to examine whether the Manufacturers accurately assigned her points under the Corrective Action Policy and whether they scrupulously followed that policy. The Manufacturers correctly argue that "[f]or pretext purposes, it does not matter whether Fletcher actually violated the Attendance Policy or engaged in misconduct, only whether the decisionmaker(s) believed in good faith Fletcher engaged in the policy violations and misconduct." Doc. 33 at 33. Federal courts "do not sit as a 'super-personnel department,' and it is not our role to second-guess the wisdom of an employer's business decisions— indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory motive." *Alvarez*, 610 F.3d at 1266 (quoting *Chapman,* 229 F.3d at 1030).

Even if the Manufacturers miscalculated Ms. Fletcher's points, she has failed to establish that there was a discriminatory reason behind that miscalculation. "An

employer 'may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long *as its action is not for a discriminatory reason.*'" *Damon v. Fleming Supermarkets, Inc.*, 196 F.3d 1354, 1363 n.3 (11th Cir. 1999) (quoting *Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321, 1324 n. 16 (11th Cir. 1998)).

Although Ms. Fletcher disagrees with the Manufacturers' decision to terminate her, she has failed to establish a genuine dispute that their reason for doing so—repeated policy violations—was pretextual. Ms. Fletcher's unsupported speculation fails to demonstrate "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" as to the Manufacturers' stated reason for her termination. *Alvarez*, 610 F.3d at 1265 (quoting *Combs*, 106 F.3d at 1538). Therefore, her claim cannot survive summary judgment under the *McDonnell Douglas* framework.

### 2. Ms. Fletcher's Suit Cannot Survive Summary Judgment On a Convincing Mosaic Theory

Ms. Fletcher argues that her claim can survive summary judgment under a convincing mosaic theory. "[A]n employee can . . . survive summary judgment by presenting 'circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent.'" *Jenkins v. Nell*, 26 F.4th 1243, 1250 (11th Cir. 2022) (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)). "A plaintiff may establish a convincing mosaic by pointing to evidence that

26

demonstrates, among other things, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) 'systematically better treatment of similarly situated employees,' and (3) pretext." *Id.* (quoting *Lewis v. City of Union City* (*Lewis II*), 934 F.3d at 1185 (11th Cir. 2019)). "The legal standard—and the question for the court at summary judgment— is only whether the evidence permits a reasonable factfinder to find that the employer [discriminated] against the employee." *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1311 (11th Cir. 2023).

Ms. Fletcher argues that the record contains evidence that the Manufacturers: "did not follow [their] attendance policy or discipline policy in disciplining male employees, den[ied] [Ms.] Fletcher levels of the progressive discipline policy," and wrongfully issued "discipline . . . to [Ms.] Fletcher used to terminate her under Defendants' progressive discipline policy." Doc. 38 at 41. But even when viewed in the light most favorable to Ms. Fletcher, the evidence she identifies would not allow a reasonable jury to conclude that the Manufacturers discriminated against her.

Specifically, Ms. Fletcher again disputes the Manufacturers' calculation of her points under the Corrective Action Policy. *See id.* She argues that "[a] reasonable jury could also conclude that [the Manufacturers] intentionally documented Fletcher's points incorrectly . . . ." *Id.* She argues that a reasonable jury could make that finding "because of the overwhelming evidence proving she only had two points

27

and the fact that her July 23, 2020, discipline was not signed by [Ms.] Harper, [Mr.] Price or [Mr.] Harrison until August 7, 2020, the day [Ms.] Fletcher complained to [Ms.] Harper." *Id.* at 41–42.

Ms. Fletcher also argues that the fact that the Manufacturers disciplined only Black females on July 23, 2020, provides "strong evidence of [the Manufacturers'] discriminatory intent." *Id.* at 42. Ms. Fletcher acknowledges that the Manufacturers issued discipline to Ms. Chavers and Mr. Ramirez but argues that discipline did not occur until twenty-two days later. *Id.* She contends that "[a] reasonable jury could conclude that [Ms.] Chavers and [Mr.] Ramirez were only disciplined because [Ms.] Fletcher complained about discrimination and Defendants believed disciplining a Caucasian and a female employee would help cover up their discriminatory intent." *Id.*

Although Ms. Fletcher speculates that the Manufacturers could have intentionally miscalculated her points for a discriminatory reason, she developed no evidence to support that assertion. The same is true for her argument that the Manufacturers disciplined Ms. Chavers and Mr. Ramirez to cover their discriminatory intent. "[T]he convincing mosaic inquiry is identical to the final stage of the *McDonnell Douglas* framework: both ask whether there is enough *evidence* for a reasonable jury to infer intentional discrimination." *Ossmann v. Meredith Corp.*, 82 F.4th 1007, 1020 (11th Cir. 2023) (emphasis added).

Ms. Fletcher does not produce such evidence that could lead a reasonable jury to find that the Manufacturers discriminated against her.

Recent binding cases on this issue confirm this conclusion. One plaintiff established a convincing mosaic of discrimination by pointing to evidence that showed: (1) another employee committed a similar violation but remained employed; (2) eighteen employees of the plaintiff's race retired, resigned, or transferred since the plaintiff's supervisor took over; (3) the supervisor mistreated three employees of the plaintiff's race; (4) the supervisor had a special relationship with the company's human resources department; (5) the supervisor made racially-biased comments about employees of the same race as the plaintiff; (6) the plaintiff declined to revise an accident report despite his supervisor's direction to do so; and (7) the supervisor gave "shifting reasons" for terminating the plaintiff. *Jenkins v. Nell*, 26 F.4th 1243, 1250–51 (11th Cir. 2022).

In another case, a plaintiff established a convincing mosaic of discrimination when he produced evidence that the employer fired seven white employees who forwarded a racially offensive email but did not fire Black employees who did the same. *Smith*, 644 F.3d at 1332, 1336. The plaintiff in *Smith* established that (1) the decisionmaker in his case discriminated against other employees of the plaintiff's race; (2) due to a past racially-motivated incident, the company treated incidents of racism differently based on the perpetrator's race; and (3) the company's

disciplinary review matrix included a column reflecting the employee's race. *Id.* at 1336, 1341–45.

In both *Jenkins* and *Smith*, a reasonable jury could have inferred discriminatory intent based on that evidence. But Ms. Fletcher's case is different and more closely resembles precedent in which the record did not support such an inference. In *Ossmann*, the employer terminated the plaintiff after "female colleagues raised repeated complaints that he engaged in inappropriate conduct and sexual harassment . . . ." 82 F.4th at 1010. The plaintiff alleged that the employer engaged in racial discrimination because the termination form "included [the plaintiff's] race, the demographics of his colleagues, and identification of potential comparator employees who had engaged in similar conduct." *Id.* at 1010–11. The Eleventh Circuit held that "[t]he presence of race data in the local station manager's termination request is not enough for any jury to reasonably conclude that [the plaintiff's] sexual harassment conduct, much of which he admitted, was pretext for the true reason for [the plaintiff's] firing—his race." *Id.* at 1011. The Eleventh Circuit specifically rejected the *Ossmann* plaintiff's convincing mosaic argument, holding that his production of "circumstantial evidence fails to create a triable question of intentional discrimination." *Id.* at 1020.

Likewise, in *Berry*, an employer terminated the plaintiff's employment after an investigation revealed "negativity, bullying, and unprofessional behavior." 84

F.4th at 1306 (cleaned up). The plaintiff argued that she presented a convincing mosaic of discrimination, which included: (1) suspicious timing between her last complaint and her termination; (2) "ambiguous statements" during interviews; (3) the alleged omission of "outlier comments" in favor of the plaintiff during investigatory interviews; and (4) evidence of "systematically better treatment" of two non-comparator employees. *Id.* at 1312. The Eleventh Circuit held that "the circumstantial evidence cited by [the plaintiff]—viewed as a whole and in the light most favorable to her—does not create a reasonable inference of intentional retaliation." *Id.* at 1313.

Against the backdrop of these precedents, the circumstantial evidence that Ms. Fletcher highlights, even when viewed in the light most favorable to her, would not allow a reasonable jury to find that the Manufacturers intentionally discriminated against her. Therefore, her claim cannot survive summary judgment under the convincing mosaic theory.

### 3. Ms. Fletcher's Suit Cannot Survive Summary Judgment On a Mixed-Motive Theory

In the alternative, Ms. Fletcher argues that her Title VII claim can survive summary judgment under a mixed-motive theory. *See* Doc. 38 at 42–44. In *Quigg*, the Eleventh Circuit held that the *McDonnell Douglas* framework "is inappropriate for evaluating mixed-motive claims because it is overly burdensome when applied

in the mixed-motive context." 814 F.3d at 1237.[2] A plaintiff asserting a Title VII claim under a mixed-motive theory must offer "evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) [a protected characteristic] was *a* motivating factor for the defendant's adverse employment action." *Id.* at 1239 (cleaned up). At the summary-judgment stage, "the court must determine whether the plaintiff has presented sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that [her protected characteristic] was a motivating factor for [an] adverse employment decision." *Id.* (cleaned up).

Ms. Fletcher's discrimination claim cannot survive summary judgment under a mixed-motive theory for two reasons. First, Ms. Fletcher provides no argument as to how her claim survives under a mixed-motive theory. She merely cites mixed-motive caselaw and argues that the Manufacturers failed to defend against a mixed-motive theory in their opening brief. *See* Doc. 38 at 42–44. The court cannot create a mixed-motive argument on Ms. Fletcher's behalf. *See Fils v. City of Aventura*, 647 F.3d 1272, 1284 (11th Cir. 2011) ("[D]istrict courts cannot concoct or resurrect arguments neither made nor advanced by the parties.") And Ms. Fletcher's statement regarding the Manufacturers' opening brief is inaccurate; the Manufacturers moved

---

[2] "Mixed-motive and single-motive discrimination are different theories of discrimination, as opposed to distinct causes of action." *Quigg*, 814 F.3d at 1235 n.4.

for summary judgment on Ms. Fletcher's Title VII discrimination claim, of which mixed-motive discrimination is only one theory of recovery. *See Quigg*, 814 F.3d at 1235 n.4.

Even if the court were to consider Ms. Fletcher's citation of mixed-motive caselaw on summary judgment, the result would not change. For example, in *Quigg*, the decisionmakers voted against hiring the female plaintiff, and there was evidence that board members made statements such as: "it is time to put a man in there"; she should "hire a tough 'hatchet man'"; and the plaintiff "needed a strong male to work under her to handle problems." 814 F.3d at 1241. In *Vinson v. Koch Foods of Alabama, LLC*, the plaintiff "present[ed] evidence that [her supervisor's] reasons for firing her were not the real reasons." 735 F. App'x 978, 981 (11th Cir. 2018). Those reasons included conflicting testimony regarding the reason for her termination and evidence that the supervisor treated persons of the same race as the plaintiff more harshly. *See id.* The evidentiary records in *Quigg* and *Vinson* would have allowed a reasonable jury to infer that discrimination was a motivating factor in the employer's decision. *See Quigg*, 814 F.3d at 1241; *see also Vinson*, 735 F. App'x at 981.

The record in this case, however, would not allow a reasonable jury to find that discrimination was a motivating factor in Ms. Fletcher's termination. There is simply no evidence to support such a finding.

Ms. Fletcher's discrimination claim cannot succeed under any theory of

liability. Accordingly, the court **GRANTS** summary judgment in favor of the Manufacturers on Ms. Fletcher's discrimination claims under Title VII and section 1981.

### B.    Ms. Fletcher's Retaliation Claim

Ms. Fletcher asserts retaliation claims against the Manufacturers under Title VII and section 1981. Doc 1 at 15–26. Title VII's retaliation provision prohibits an employer from "discriminat[ing] against" an employee because she "opposed any practice" made unlawful by Title VII or "made a charge, testified, assisted, or participated in" a Title VII proceeding or investigation. 42 U.S.C. § 2000e–3(a).

"To establish a claim of retaliation, [a plaintiff] must prove that she engaged in statutorily protected activity, that she suffered an adverse action, and that the adverse action was causally related to the protected activity." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924 (11th Cir. 2018).

"After the plaintiff has established the elements of a claim, the employer has an opportunity to articulate a legitimate, nonretaliatory reason for the challenged employment action as an affirmative defense to liability." *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008). "The plaintiff bears the ultimate burden of proving retaliation by a preponderance of the evidence and that the reason provided by the employer is a pretext for prohibited retaliatory conduct." *Id.*

The parties do not dispute that Ms. Fletcher has established the first and

second elements of a retaliation claim. She engaged in statutorily protected activity when she complained that the discipline she received for violating the COVID-19 policy was racially discriminatory. *See Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 715 n.2 (11th Cir. 2002) ("[The plaintiff] engaged in protected activity . . . by voicing complaints of discrimination to his supervisors."). And Ms. Fletcher experienced an adverse employment action because the Manufacturers terminated her employment. *See Brooks v. Progress Rail Servs. Corp.*, No. 2:18-CV-01956-RDP, 2020 WL 2198960, at *8 (N.D. Ala. May 6, 2020) ("[F]or obvious reasons, Plaintiff's termination qualifies as an adverse employment action.").

The parties dispute whether Ms. Fletcher has established the third element of a retaliation claim—causation. To establish causation, "a plaintiff must prove that had she not complained, she would not have been" subjected to the challenged mistreatment. *Jefferson*, 891 F.3d at 924. Proof that the adverse action came shortly after the protected activity can establish causation. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007); *see also Jefferson*, 891 F.3d at 926 ("[W]e have explained that an employee's termination within days—or at the most within two weeks—of his protected activity can be circumstantial evidence of a causal connection between the two.").

Ms. Fletcher argues that she voiced complaints of discrimination on July 23, 2020 and on August 7, 2020. Doc. 38 at 46. The Manufacturers terminated her

employment on August 14, 2020. *Id.* So Ms. Fletcher has established a *prima facie* retaliation case.

Nonetheless, Ms. Fletcher's claim fails because she cannot establish that the Manufacturers' stated reason for her termination is pretextual. The Manufacturers argue that they terminated Ms. Fletcher due to multiple policy violations. *See* Doc. 33 at 38. Because that articulated reason "is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman*, 229 F.3d at 1030. "A reason is not pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." *Brooks v. Cnty. Comm'n of Jefferson Cnty.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (cleaned up).

Ms. Fletcher offers no evidence or argument, aside from the temporal proximity of her complaints and her termination, to rebut the Manufacturers' stated reason for her termination. The Eleventh Circuit has never held that temporal proximity, standing alone, can by itself establish pretext. *See, e.g.*, *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1137 n.15 (11th Cir. 2020) (en banc) (affirming district court's grant of summary judgment on plaintiff's retaliation claim and holding that "[w]hile close temporal proximity between the protected conduct and the adverse employment action can establish pretext when coupled with other

36

evidence, temporal proximity alone is insufficient"). She offers no evidence that the reason was false, let alone that discrimination was the real reason. Thus, she fails to establish that the Manufacturers stated basis for her termination is pretextual.

Accordingly, the court **GRANTS** summary judgment in favor of the manufacturers on Ms. Fletcher's retaliation claims under Title VII and section 1981.

## IV.   CONCLUSION

The court **GRANTS** the Manufacturers' motion for summary judgment. The Clerk of Court is **DIRECTED** to close the case.

**DONE** and **ORDERED** this 9th day of January, 2024.

**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE